Robert I. Steiner (Atty. No. 027331996)
Ryan M. Dunn (Atty. No 305972019)
Kelley Drye & Warren LLP
7 Giralda Farms, Suite 340
Madison, NJ 07940
Phone: (973) 503-5900
Fax: (973) 503-5950
Email: rsteiner@kelleydrye.com
rdunn@kelleydrye.com

*Attorneys for Plaintiffs*
*Money Mailer, LLC and Salu Group, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MONEY MAILER, LLC and SALU GROUP, INC., | |
| Plaintiffs, | Civil Action No.: 3:26-cv-07065 |
| v. | **COMPLAINT** |
| THOMAS R. BABER, JR., | |
| Defendant. | |

Plaintiffs Money Mailer, LLC ("Money Mailer") and Salu Group, Inc. ("SGI") (collectively, "Plaintiffs"), by and through their attorneys, Kelley Drye & Warren LLP, as for their Complaint against Defendant Thomas R. Baber, Jr. ("Baber"), allege as follows:

**<u>Introduction</u>**

1. This action arises out of former employee and officer of Money Mailer Thomas R. Baber's theft of trade secrets, betrayal of his fiduciary, breach of contracts and other legal obligations to Money Mailer by, among other things, using Money Mailer's trade secret and confidential business information to engage in a competing business enterprise and usurping a

corporate opportunity that fell squarely within Money Mailer's line of business for his own personal gain.

2. When presented with an acquisition opportunity for a competing business of Money Mailer, including a confidential and trade secret financial analysis of the proposed transaction Baber—Money Mailer's chief executive officer and the company's industry expert—strongly opposed it. Relying on Baber's opposition to the purchase and his decades of industry expertise, Money Mailer declined to proceed with the acquisition. Mere months later, however, Money Mailer discovered the true reason for Baber's vehement opposition: Baber hoped to, and ultimately did, acquire the competing business for himself, including by, upon information and belief, relying on Money Mailer's own confidential and trade secret analysis of it, all without disclosing to Money Mailer his intention to seize the opportunity for his own benefit and to improperly compete with Money Mailer.

3. Had Baber properly advised Money Mailer, as he was required to do consistent with his fiduciary obligations as a corporate officer, Money Mailer could have and would have moved forward with the acquisition. Money Mailer only later learned of Baber's deceit when he inadvertently revealed he had made the acquisition for himself.

4. As a result of his actions, Plaintiffs seek monetary damages and equitable relief to redress Baber's breaches of his fiduciary obligations, employment contract and related agreements, and material misrepresentations, among other causes of action and claims for relief. Plaintiffs also seek injunctive relief only as it relates to enforcing Baber's non-competition covenant.

## **The Parties and Jurisdiction**

5. Money Mailer is a Missouri limited liability company with its registered offices located at 231 S. Bemiston Avenue, Suite 850, PMB 430920, St. Louis, Missouri 63025.

6. SGI is a Delaware corporation with its registered offices located at 400 N. Tampa Street, Suite 1550, PMB 130924, Tampa, Florida 33602. SGI holds a ninety percent (90%) membership interest in Money Mailer.

7. Upon information and belief, Baber is a New Jersey resident with an address located at 5 Wetherill Drive in Millstone Township, Monmouth County, New Jersey 08510. Baber holds a ten percent (10%) membership interest in Money Mailer.

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 with respect to Plaintiffs' claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836(c), and pursuant to 28 U.S.C. § 1367 with respect to Plaintiffs' claims under state law.

9. This Court has personal jurisdiction over Baber and venue is proper in this judicial district because (a) the action arises out of Baber's activities within this district, (b) Baber is domiciled in the State of New Jersey, and (c) pursuant to Section 14 of Baber's employment agreement (the "Employment Agreement"), the parties consented to jurisdiction in this district.

**Money Mailer's Business and the Operating Agreement**

10. On or about February 17, 2023, Money Mailer was formed as a limited liability company under the laws of the State of Missouri to affect the purchase of certain assets and liabilities from MoneyMailerUSA Incorporated ("MMUSA"), a long-established franchisor in the direct mail marketing industry.

11. Money Mailer is itself a direct mail, shared envelope, and digital marketing franchisor in the rapidly growing local advertising space. Money Mailer contracts with franchisees throughout the country that operate direct mail, shared envelope, and digital marketing in their respective geographic areas. Money Mailer has nearly 200 franchisees in over thirty states across the country.

12. In addition to its franchisor-franchisee business, Money Mailer actively acquires local publications and media assets in select markets, including, without limitation, shared mailers, coupon magazines, community publications, and hyper-local shopper guides. This is a critical component of Money Mailer's growth strategy.

13. At the time of Money Mailer's formation, JAL was its sole member.

14. On or about March 6, 2023, JAL and Baber entered into an Amended and Restated Limited Liability Company Agreement of Money Mailer, LLC (the "Operating Agreement"), which is Money Mailer's controlling operational document. A true and correct copy of the fully executed Operating Agreement is attached hereto as **Exhibit A.**

15. Pursuant to the Operating Agreement, Baber was given a ten percent (10%) membership interest in Money Mailer, while JAL retained a ninety percent (90%) membership interest in Money Mailer.

16. Section 4.1 of the Operating Agreement provides that Money Mailer is a manager-managed limited liability company and designated JAL as the initial Manager.

17. Section 4.1(c) of the Operating Agreement empowered the Manager to "designate one or more officers with such titles as may be designated by the Manager to act in the name of [Money Mailer] with such authority as may be delegated to such officers by the Manager" and further provided that "[a]ny such Officer shall act pursuant to such delegated authority until such Officer is removed by the Manager."

18. The Operating Agreement designated Eran Salu as the initial officer of Money Mailer.

19. Section 13.1 of the Operating Agreement contains a Missouri choice of law clause applicable to the Operating Agreement "and the application or interpretation [t]hereof."

20. In or around December 2024, JAL's membership interest was transferred to SGI. Accordingly, SGI presently holds a ninety-percent (90%) membership interest in Money Mailer, and Baber holds a ten-percent (10%) membership interest in Money Mailer.

**The Employment Agreement**

21. Contemporaneous with execution of the Operating Agreement, Money Mailer and Baber entered into the Employment Agreement. A true and correct copy of the Employment Agreement is attached hereto as **Exhibit B.**

22. Pursuant to the Employment Agreement, Baber was designated Chief Executive Officer ("CEO") of Money Mailer for an initial five-year term effective March 6, 2023.

23. Section 1 of the Employment Agreement provided, in pertinent part, as follows regarding Baber's responsibilities as CEO:

> [Baber] will be responsible for managing the day-to-day business of the Money Mailer business and such other responsibilities and decisions customarily in that role and as requested from time to time. [Baber] will report to Eran Salu or his designee . . . . [Baber] shall work exclusively for [Money Mailer] unless [Money Mailer] provides prior written consent for [Baber] to dedicate time to other business ventures.

24. This provision listed just four existing business ventures disclosed by Baber, which the parties agreed Baber could continue during his employment as CEO.

25. These pre-existing business ventures were limited to "(1) IHOP franchises, (2) ownership and management of Performance Franchise Consultants, (3) ownership and management of Launch Pad Consulting, and (4) franchise engagement with [Baber]'s spouse."

26. Money Mailer's decision to purchase MMUSA was premised largely on Baber's agreement to act as Money Mailer's CEO because Baber had served as CEO for MMUSA for

many years and had substantial institutional knowledge regarding the business and the local advertising industry.

27. Baber held himself out to Money Mailer, JAL, and Eran Salu as having particular expertise and knowledge in the local advertising industry and expressed a desire to continue in his chief executive role following Money Mailer's purchase of MMUSA.

28. Baber further represented to Money Mailer, JAL and Eran Salu that he wished to continue participating in the growth of Money Mailer's business including through acquisitions.

29. Money Mailer relied on these representations in making its decision to purchase MMUSA and hiring Baber as CEO.

30. This reliance is evidenced by, among other things, the recitals set forth in the Employment Agreement, which expressly refer to Money Mailer's acquisition of certain of MMUSA's assets and liabilities and Baber's employment by MMUSA as CEO prior to the acquisition.

31. Pursuant to his role as CEO, Baber was ultimately responsible for Money Mailer's day-to-day operations and charged with making operational recommendations to Plaintiffs, including recommendations regarding acquisitions, business partnerships, franchisee relations, and many other tasks.

32. Section 9 of the Employment Agreement sets forth the requirements for Baber's employment. Section 9.1 establishes the requirements of termination "for cause" while Section 9.2 establishes the requirements of termination "without cause."

33. Under Section 9.1, Baber could be terminated for cause by, among other things, failing to perform his duties as CEO, breaching the Employment Agreement, engaging in illegal

or other misconduct injurious to Money Mailer or its affiliates, disclosing confidential information without authorization, or by violating Money Mailer's written policies or codes of conduct.

34. Section 14 of the Employment Agreement contains a New Jersey forum selection clause that applies to "[a]ny disputes arising out of or relating to th[e] [Employment] Agreement or the relationship between [Money Mailer] and [Baber], including torts . . . ."

35. This provision further requires all such disputes to be "brought in Monmouth County, New Jersey or, if federal jurisdiction exists, the U.S. District Court for the [sic] New Jersey" and provides that Money Mailer and Baber "submit to the jurisdiction and venue of those courts and waive the right to contest the jurisdiction and venue in those courts."

36. Section 15 of the Employment Agreement contains a New Jersey choice of law clause, which provides the Employment Agreement "shall be construed, and all the rights, powers and liabilities of the parties [t]hereunder shall be determined in accordance with the laws of the state of New Jersey."

## The Protective Agreement and Employee Handbook

37. The Employment Agreement incorporated by reference a protective agreement (the "Protective Agreement") and employee handbook (the "Handbook"). True and correct copies of the Protective Agreement and Handbook are attached hereto as **Exhibit C** and **Exhibit D**, respectively.

38. Pursuant to the Protective Agreement, Baber agreed to protect certain confidential, proprietary and trade secret information of ColorArt LLC, and its affiliates, subsidiaries, successors, and assigns, to which Baber would have access by virtue of his employment with Money Mailer.

39. The Protective Agreement defines "ColorArt" as "ColorArt LLC and its affiliates, subsidiaries, successors, and assigns." Money Mailer was and has been at all relevant times an "affiliate" of ColorArt LLC.

40. The Protective Agreement defines the term "Trade Secrets and Other Confidential Information" as the following items "that were disclosed to [Baber] or of which [Baber] became aware as a consequence of [his] relationship with [Money Mailer], and that are not in the public domain" including, as relevant here: (a) "production technologies, processes, techniques, equipment lists, equipment specifications, proprietary equipment design and modification, and technology in development"; (b) "marketing strategies and plans"; and (c) financial information, including sales, cost, profit, and loss data."

41. Pursuant to Section 1(b) of the Protective Agreement, Baber agreed to "keep secret and treat confidentially all of [the] Trade Secrets and Confidential Information" and to not "disclose, use, aid others in using, reproduce, permit the reproduction of, remove, or permit the removal of [the] Trade Secrets and Other Confidential Information."

42. Section 1(c) of the Protective Agreement prohibited Baber from downloading or transferring the Trade Secrets and Other Confidential Information "on or to any computer that is not a [Money Mailer] computer, or creat[ing] a backup of [the] Trade Secrets or Other Confidential Information for [his] own use or the use of any other person or entity."

43. The Protective Agreement also prohibited Baber from soliciting Money Mailer's customers or employees, directly or indirectly, while employed by Money Mailer, and for a period of 365 days from the last date of his employment.

44. In particular, under Section 3(a) of the Protective Agreement, Baber is prohibited from soliciting, directly or indirectly, any customer of Money Mailer, "(a) who [he] solicited,

contacted, or serviced during the last 12 months of his employment" or "(b) whose account [he] managed during [his] employment with [Money Mailer]."

45. Under Section 4(a) of the Protective Agreement, Baber was prohibited from directly or indirectly (1) soliciting or recruiting an employee of Money Mailer "to establish, work for, or consult with a business that sells the same or similar products or services that [Money Mailer] sells" or (2) "interfer[ing] with [Money Mailer]'s employment of a [Money Mailer] employee."

46. Baber's confidentiality obligations and the prohibition against using Money Mailer's business information for personal gain were reiterated in the Handbook.

47. For example, the Handbook provides that an employee "must never use [Money Mailer's] property or information for personal gain or personally take for [himself] any opportunity that is discovered through [his] position with [Money Mailer]."

48. The Handbook contains a non-exhaustive list of "types of activities" that violate these confidentiality obligations and prohibition against misappropriating corporate opportunities, including, in pertinent part, the following: (1) "[b]eing employed . . . by, or acting as a consultant to, a competitor or potential competitor, . . . regardless of the nature of the employment, while you are employed with [Money Mailer]"; (2) "[s]erving as a board member for an outside commercial company or organization"; (3) "[o]wning or having a substantial interest in a competitor"; (4) "[h]aving a personal interest, financial interest, or potential gain in any of [Money Mailer's] transactions"; (5) "[e]ngaging in activities that will bring direct or indirect profit to a competitor"; or (6) "[u]sing [Money Mailer]'s equipment or means to support an external business."

49. The Handbook also prohibited the use of company-issued technology for any purpose other than "business-related matters during working hours."

**The Money Mailer of Mercer County Franchise Agreement**

50. The assets and liabilities purchased by Money Mailer from MMUSA included a franchise agreement (the "Franchise Agreement") between MMUSA, as franchisor, and Baber, operating under the trade name Money Mailer of Mercer County, as franchisee.

51. On or about January 27, 2011, MMUSA's predecessor, Money Mailer Franchise Corp., as franchisor, and Baber, as franchisee, entered into the Franchise Agreement. A true and correct copy of the Franchise Agreement is attached hereto as **Exhibit E.**

52. The Franchise Agreement had an initial "Term" that expired as of March 30, 2019.

53. On or about February 1, 2023, MMUSA and Baber executed an addendum to the Franchise Agreement ("Franchise Agreement Addendum"). Among other things, the Franchise Agreement Addendum extended the Term until June 1, 2027. A true and correct copy of the Franchise Agreement Addendum is attached hereto as **Exhibit F.**

54. On or about March 6, 2023, the Franchise Agreement was assigned to Money Mailer, and Money Mailer consented to such assignment.

55. Section 3 of the Franchise Agreement grants Baber a non-exclusive franchise and license to use certain intellectual property of Money Mailer and its various proprietary systems, trade secrets and methods of operation.

56. Section 8.13 of the Franchise Agreement contains a non-competition clause that prohibits Baber from competing with Money Mailer during the Term of the Franchise Agreement, and for a period of two years thereafter.

57. In particular, Section 8.13(a) prohibits Baber from "engag[ing] in any Competitive Activities" during the Term of the Franchise Agreement

58. Section 8.13(a) of the Franchise Agreement defines "Competitive Activities" as "any and all acts or activities which either directly or indirectly aids or assists in the conduct of any business that is similar or related to the Business, whether carried out as a proprietor, partner, interest holder, investor, shareholder, director, officer, employee, principal, agent, independent contractor, advisor or consultant."

59. Section 3.1(a) of the Franchise Agreement defines "Business" as collectively referring to and including "Shared Mailings" and "Ancillary Services."

60. Section 3.1(a)(i) of the Franchise Agreement defines "Shared Mailings" as "direct marketing and related advertising services to multiple business clients whose advertisements are combined and mailed within the same envelop, magazine or in any other grouped format to households with a specified territory.

61. Section 3.1(a) of the Franchise Agreement defines "Ancillary Services" as including "One to One Mailings" and "Interactive Advertising."

62. Section 3.1(a)(ii) of the Franchise Agreement defines "One to One Mailings" as advertising services for individual business clients whose advertisements are mailed on an individual, or 'One to One' bases."

63. Section 3.1(a)(iii) of the Franchise Agreement defines "Interactive Advertising" as "online, mobile, interactive and other electronic mobile advertising services."

64. Section 8.13(b) also prohibits Baber from engaging in any Competitive Activities within a 25-mile radius of the territory of his franchise for a period of two years following termination of the Franchise Agreement.

65. While Section 15.2 of the Franchise Agreement contains an arbitration clause, section 15.3 specifically provides that claims for equitable relief, including injunctive relief, may be brought in a court of competent jurisdiction.

**Money Mailer's Opportunity to Purchase RSVP Advertising, LLC**

66. On or about September 17, 2025, Money Mailer learned of a potential opportunity to acquire RSVP Advertising, LLC ("RSVP").

67. RSVP has at all relevant times been a direct competitor of Money Mailer in the direct mail and shared-envelope industry.

68. Money Mailer began the due diligence process for the acquisition of RSVP in or about October 2025.

69. As part of that process, Money Mailer obtained a comprehensive due diligence package from RSVP that included historic financial data, future financial projections, customer account data, and employee census information.

70. Through time, effort and expense, Money Mailer had a confidential financial analysis of this initial due diligence information conducted to assist Money Mailer in deciding whether to move forward with the acquisition process.

71. Money Mailer, through Eran Salu, provided this financial data and confidential analysis to Baber and asked Baber, as Money Mailer's CEO, to evaluate and advise on the proposed transaction.

72. Baber regularly advised Money Mailer regarding the potential acquisition of businesses in the industry because Baber was the industry expert.

73. Rather than fairly and objectively presenting his opinion and recommendation to Money Mailer, Baber strongly recommended against pursuing the acquisition.

74. Money Mailer, relying on the advice of Baber as CEO, who was an industry subject matter expert, declined to move forward with the RSVP transaction. On October 14, 2025, Baber informed RSVP that Money Mailer would not be pursuing the acquisition opportunity.

**Money Mailer Discovers Baber's Deceit and Terminates His Employment**

75. Just days after intentionally steering Money Mailer away from the RSVP acquisition opportunity, Baber began negotiating to acquire RSVP for himself, in part, upon information and belief, based on Money Mailer's own trade secret analysis of the transaction to which Baber only had access to by virtue of his senior leadership role at Money Mailer.

76. Mere months after the opportunity was initially presented to Money Mailer, Baber closed on a transaction to purchase RSVP thereby becoming the sole owner of one of Money Mailer's competitors.

77. Money Mailer only learned of Baber's acquisition of RSVP when Baber inadvertently left a RSVP-branded background on-screen during a Money Mailer video conference meeting.

78. When confronted with his apparent association with RSVP, Baber admitted that he acquired RSVP.

79. Baber never requested Plaintiffs' consent prior to acquiring RSVP, never received permission to use Money Mailer's own confidential business information for his own benefit, and did not otherwise inform Plaintiffs of his intention to acquire RSVP before doing so.

80. Had Baber requested such consent, permission, or informed Plaintiffs of his intentions, Plaintiffs never would have agreed to permit Baber to proceed as he did, including by acquiring a direct competitor, such as RSVP, given his position as a trusted corporate fiduciary.

81. Only later did Money Mailer discover that Baber, among other things, sent RSVP's due diligence information, and the confidential analysis prepared by Money Mailer's financial analyst, to his personal email account, using his Money Mailer email address.

82. Baber's obvious purpose in forwarding this information to his personal email address was so that he could use, for his own benefit, Money Mailer's confidential business information and/or trade secret information for his personal gain in violation of the Employment Agreement, Protective Agreement, Handbook and applicable law.

83. Importantly, Baber's self-serving recommendation to reject the RSVP opportunity occurred during a time when Money Mailer was experiencing operational challenges due to its printing partner's financial difficulties and ultimate bankruptcy.

84. Baber was well aware of this operational challenge as Money Mailer's CEO, and because Money Mailer, through Salu, had requested multiple times that Baber identify another printing company as an alternative if Money Mailer's existing printer could no longer perform.

85. RSVP evidently has its own printing partner, which would have provided an extremely beneficial operational safety net to Money Mailer to protect against the potential insolvency of Money Mailer's existing printer.

86. On information and belief, Baber purchased RSVP, so he could steer Money Mailer's franchisees, many of whom he had cultivated a relationship with by virtue of his position as CEO, to RSVP thereby competing with Money Mailer.

87. Money Mailer has also learned that Baber has been attempting to solicit Money Mailer's employees to his new business venture in violation of the Employment Agreement and Protective Agreement.

88. On January 6, 2026, Baber received an email to his Money Mailer email address from Nick Howard, Money Mailer's Vice President of Corporate Sales & Marketing, in which Mr. Howard refers to Baber's efforts to convince him to join RSVP as an employee and/or stakeholder.

89. Just as Baber did with the email regarding the confidential financial analysis of RSVP conducted by Money Mailer's analyst, Baber forwarded Mr. Howard's email to his personal email address.

90. Baber's efforts to solicit Money Mailer's employees and customers to his new business venture is a violation of the Employment Agreement and Protective Agreement, and his operation of RSVP in competition with Money Mailer in the shared mail and shared-envelope industry is a violation of the Franchise Agreement which prohibits Baber from engaging in any acts or activities that aid or assist any business similar or related to Money Mailer's business.

91. Additionally, after he acquired RSVP, Baber devoted less attention to his duties and responsibilities as CEO of Money Mailer, including by cancelling meetings with Salu on multiple occasions. Baber frequently emphasized how little time he had to dedicate to Money Mailer's operations.

92. Baber was effectively performing two full time jobs and, consequently, his attentiveness and availability to perform his responsibilities as CEO suffered.

93. In light of these blatant fiduciary breaches and violations of the parties' various agreements and other unlawful conduct, Money Mailer was left with no choice but to terminate Baber's employment for cause under the Employment Agreement.

94. Accordingly, on or about April 9, 2026, Plaintiffs sent Baber notice of his fiduciary breaches, contractual breaches, and demanded transfer of Baber's interest in RSVP to Money

Mailer (the "Termination Notice"). A true and correct copy of this notice is attached hereto as **Exhibit G.**

95. The Termination Notice further advised that absent Baber's agreement to transfer his interest in Money Mailer, with a full accounting, by April 16, 2026, Baber's employment with Money Mailer would be terminated with cause.

96. Baber refused to agree to Plaintiffs' demands.

97. Accordingly, Baber was terminated with cause effective May 26, 2026.

98. Upon information and belief, Baber through RSVP continues to compete with Money Mailer and continues to solicit Money Mailer customers.

**COUNT I**

**(Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1832, *et seq.*)**

99. Plaintiffs expressly incorporate the allegations set forth above as if fully set forth herein.

100. The Defend Trade Secrets Act (the "DTSA") defines a "trade secret" to include all forms and types of financial, business or economic information—including plans, compilations, methods, techniques, processes, procedures or programs if (a) the owner of the information has taken reasonable measures to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known or readily ascertainable through independent development by persons who can obtain economic value from its disclosure or use.

101. Money Mailer maintains proprietary financial analytics generated by its financial analysts for purposes of considering potential acquisition targets, and generated such information as part of evaluating the acquisition of RSVP. In addition to this financial information and its analysis of financial information, Money Mailer maintains other proprietary internal information

regarding management, operations, and marketing, including customer and franchisee lists (collectively, "Trade Secrets").

102. These Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value for the use or disclosure thereof.

103. Money Mailer took reasonable means to maintain the secrecy of the Trade Secrets by, among other things, requiring password protection to access Money Mailer technology, by limiting access to such information to employees who need it to perform their work, and by requiring its employees, including Baber, to enter into the Protective Agreement, which contained provisions protecting Money Mailer's confidential and proprietary business information.

104. Baber had access to the Trade Secrets by virtue of his position as employee and CEO of Money Mailer.

105. The Trade Secrets are connected to interstate commerce. In particular, the Trade Secrets include confidential and proprietary financial analysis and customer information prepared by Money Mailer, a business entity that is a citizen of Missouri, New Jersey, Delaware and Florida and conducts business throughout the country.

106. Baber obtained the Trade Secrets by improper means and without authorization, including by, among other conduct, emailing such information to his personal email address and using such information to serve his own personal benefit, including, upon information and belief, by using Money Mailer's financial analytics to acquire RSVP himself and its customer information to improperly compete with Money Mailer for his own benefit.

107. Baber knew or should have known that the financial analysis he sent to his personal email account constituted a trade secret.

108. Baber knew or should have known that the customer, franchisee and/or employee information in his possession constituted a trade secret.

109. The Trade Secrets confer an economic advantage to Money Mailer over its competitors, and such information would be extremely valuable to a competitor, as evidenced by Baber's reliance on the Trade Secrets to facilitate his purchase of a direct competitor of Money Mailer and attempts to use other Money Mailer Trade Secrets to further his own business interests to the detriment of Money Mailer.

110. Upon information and belief, Baber has used or intends to use the unlawfully obtained Trade Secrets in his efforts on behalf of RSVP including to solicit customers, franchisees and/or employees to RSVP, a direct competitor of Money Mailer.

111. Baber's theft and unauthorized use of the Trade Secrets, which Baber obtained through improper means, constitute misappropriation of trade secrets in violation of the DTSA.

112. By reason of the foregoing, Money Mailer has been irreparably harmed and damaged.

**COUNT II**

**(Violation of New Jersey Trade Secret Act, N.J.S.A. § 56:15-1, *et seq.*)**

113. Plaintiffs expressly incorporate the allegations set forth above as if fully set forth herein.

114. Money Mailer maintains Trade Secrets, which include proprietary financial analytics generated by its financial analysts for purposes of considering potential acquisition targets, including acquisition of RSVP, as well as other internal information regarding management, operations, and marketing, including customer and franchisee lists.

115. The Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value for the use or disclosure thereof.

116. Money Mailer took reasonable means to maintain the secrecy of the Trade Secrets by, among other things, requiring password protection to access Money Mailer technology, by limiting access to such information to employees who need it to perform their work, and by requiring its employees, including Baber, to enter into the Protective Agreement, which contained provisions protecting Money Mailer's confidential information.

117. Baber had access to the Trade Secrets by virtue of his position as employee and CEO of Money Mailer.

118. Baber misappropriated the Trade Secrets by, among other conduct, emailing such information to his personal email address and using such information to serve his own personal benefit, including by using Money Mailer's financial analytics to acquire RSVP himself, and to attempt to solicit Money Mailer employees to his new business venture.

119. Baber undertook these actions in bad faith.

120. By reason of the foregoing, Money Mailer has been irreparably harmed and damaged.

**COUNT III**

**(Common Law Misappropriation)**

121. Plaintiffs expressly incorporate the allegations set forth above as if fully set forth herein.

122. Money Mailer possesses trade secrets and confidential, proprietary business information, including, without limitation, the Trade Secrets.

123. This information was not known outside of Money Mailer, which password-protected its software and/or electronic devices containing such information.

124. This information is highly proprietary to Money Mailer, and would be of immense value to a competitor, as evidenced by Baber's use of the Trade Secrets to acquire a competitor and compete against Money Mailer.

125. Money Mailer expended significant efforts and money in developing this information, which could not have been easily acquired or duplicated by others.

126. Baber has wrongfully used and/or disclosed such information in bad faith.

127. By reason of the foregoing, Money Mailer has been irreparably harmed and damaged.

## COUNT IV

## (Unfair Competition)

128. Plaintiffs expressly incorporate the allegations set forth above as if fully set forth herein.

129. Through Baber's wrongful acts and conduct, he has acted unfairly against and unfairly competed with, or is attempting to unfairly compete with, Money Mailer by, among other things, using and/or disclosing the Trade Secrets.

130. By reason of the foregoing, Money Mailer has been irreparably harmed and damaged.

## COUNT V

## (Breach of Fiduciary Duty)

131. Plaintiffs expressly incorporate the allegations set forth above as if fully set forth herein.

132. Baber owed fiduciary duties to Plaintiffs by virtue of his position as a corporate officer of Money Mailer. Baber's fiduciary duties to Plaintiffs include the duty of care, good faith, and loyalty. These fiduciary duties extended to the members of Money Mailer, including SGI.

133. Baber's fiduciary obligations included obligations to act in the best interest of Money Mailer and its members, including putting the interests of Money Mailer and its members before his own, and to act with the care a corporate officer of like position would exercise under similar circumstances.

134. Baber breached his duties of care, good faith, and loyalty by, among other actions:

(a) Acquiring a directly competing business after recommending Money Mailer decline an opportunity to acquire the very same business;

(b) Engaging in a directly competing business without disclosing his activities to Plaintiffs and without Plaintiffs' consent;

(c) Using Money Mailer's assets and business information for the benefit of Baber's new business venture, rather than the business of Money Mailer, and performing work for other business ventures during Money Mailer's regular business hours;

(d) Misappropriating confidential business information and/or trade secret information of Money Mailer to serve his own interests, rather than the interests of Money Mailer; and

(e) Attempting to solicit Money Mailer's employees to his new business venture;

135. By reason of the foregoing, Plaintiffs have been irreparably harmed and damaged.

**<u>COUNT VI</u>**

**(Usurpation of Corporate Opportunity)**

136. Plaintiffs expressly incorporate the allegations set forth above as if fully set forth herein.

137. Baber had a fiduciary obligation to Money Mailer.

138. By acquiring for himself a company that Money Mailer had an opportunity to purchase, after causing Money Mailer to reject said opportunity, Baber has taken a corporate opportunity for himself without first affording the opportunity to Money Mailer.

139. Money Mailer was financially capable of taking the opportunity.

140. The opportunity was within Money Mailer's line of business as a direct competitor in Money Mailer's industry.

141. Money Mailer had a reasonable expectancy in the opportunity, and in fact was in the midst of due diligence to move forward on the opportunity, before Baber, in his capacity as CEO, caused Money Mailer to reject the opportunity.

142. By reason of the foregoing, Money Mailer has been irreparably harmed and damaged.

**COUNT VII**

**(Breach of Contract – Employment Agreement)**

143. Plaintiffs expressly incorporate the allegations set forth above as if fully set forth herein.

144. The Employment Agreement, together with the Protective Agreement and Handbook, which were incorporated by reference with the Employment Agreement, is a valid contract.

145. Money Mailer duly performed its obligations under said contract.

146. Baber breached said contract by, among other reasons, the following:

(a) Performing work for business venture(s) other than those expressly enumerated in the Employment Agreement without the prior written consent of Money Mailer and, in fact, performing work for a direct competitor of Money Mailer;

(b) Using Money Mailer's confidential and/or trade secret information for his own personal gain in violation of the Protective Agreement, including, without limitation, Money Mailer's marketing strategies and plans, and financial information, including sales, cost, profit, and loss data.

(c) On information and belief, attempting to divert Money Mailer's franchisees and/or customers to a competing business venture;

(d) Attempting to solicit Money Mailer's employees to a competing business venture or otherwise interfering with Money Mailer's employees' performance of their duties for Money Mailer;

(e) Using Money Mailer's property and/or information for personal gain, including using Money Mailer's technology and financial data for the purposes of acquiring and operating a competing business.

(f) Being employed by a competing business that was not disclosed to Money Mailer as required by the Employment Agreement;

(g) Owning or having a substantial business interest in a competitor;

(h) Engaging in activities that will bring financial gain to a direct competitor, rather than Money Mailer; and

(i) Using Money Mailer's company-issued technology for purposes unrelated to Money Mailer's business.

147. By reason of the foregoing, Money Mailer has been irreparably harmed and damaged.

**COUNT VIII**

**(Breach of Contract – Franchise Agreement)**

148. Plaintiffs expressly incorporate the allegations set forth above as if fully set forth herein.

149. The Franchise Agreement is a valid contract.

150. Money Mailer duly performed its obligations under said contract.

151. Baber breached said contract by, among other reasons, engaging in prohibited Competitive Activities, as that term is defined in Section 8.13 of the Franchise Agreement.

152. In particular, Baber acquired an interest in RSVP, a direct competitor of Money Mailer in the shared mail and shared-envelope business. Baber is therefore an "interest holder" aiding or assisting in the conduct of a business that is similar or related to the business of Money Mailer.

153. Such conduct is expressly prohibited during the Term of the Franchise Agreement, which is currently set to expire June 1, 2027.

154. By reason of the foregoing, Money Mailer has been irreparably harmed and Money Mailer is entitled to injunctive and equitable relief. Money Mailer is not seeking monetary relief in this action for Baber's breach of the Franchise Agreement, but expressly reserves its right to do so in a separate action.

**COUNT IX**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing – Operating Agreement)**

155. Plaintiffs expressly incorporate the allegations set forth above as if fully set forth herein.

156. Under Missouri law, every contract has implied in it a covenant of good faith and fair dealing. The covenant of good faith and fair dealing calls for each party to a contract to refrain

from doing anything that will have the effect of destroying or injuring the right of the other party to receive the benefits of the contract.

157. Baber, as a member in Money Mailer and party to the Operating Agreement, owed a duty of good faith and fair dealing to Plaintiffs by reason of his having undertaken obligations in and under the Operating Agreement.

158. As detailed above, Baber has engaged in purposeful and intentional conduct that has defeated the purposes of the Operating Agreement and undermined Plaintiffs' intended benefit under the Operating Agreement, namely that in exchange for Baber's ten-percent (10%) membership interest he would serve as CEO of Money Mailer and act in Money Mailer's best interests, and in the best interest of the members, rather than in his own interests and to the detriment of Money Mailer and its members.

159. By reason of the foregoing, Plaintiffs have been irreparably harmed and damaged.

## **COUNT X**

### (Breach of the Implied Covenant of Good Faith and Fair Dealing – Employment Agreement)

160. Plaintiffs expressly incorporate the allegations set forth above as if fully set forth herein.

161. Under New Jersey law, every contract has implied in it a covenant of good faith and fair dealing. The covenant of good faith and fair dealing calls for each party to a contract to refrain from doing anything that will have the effect of destroying or injuring the right of the other party to receive the benefits of the contract.

162. Baber, as a party to the Employment Agreement, which incorporated by reference the Protective Agreement and Handbook, owed a duty of good faith and fair dealing to Money Mailer by reason of his having undertaken obligation in and under the Employment Agreement.

163. As detailed above, Baber has engaged in purposeful and intentional conduct that has defeated the purposes of the Employment Agreement and undermined Money Mailer's intended benefit under the Employment Agreement, namely that in exchange for Baber's salary, he would serve as CEO of Money Mailer and act in Money Mailer's best interests, rather than in his own interests and to the detriment of Money Mailer.

164. By reason of the foregoing, Money Mailer has been irreparably harmed and damaged.

**COUNT XI**

**(Unjust Enrichment)**

165. Plaintiffs expressly incorporate the allegations set forth above as if fully set forth herein.

166. By the acts and conduct described above, Baber has sought to unjustly enrich himself, and has unjustly enriched himself, at Plaintiffs' expense.

167. By the acts and conduct described above, Baber has received benefits from Plaintiffs, namely, the Trade Secrets and any profits or other benefits derived from Baber's acquisition of RSVP.

168. By reason of the foregoing, Plaintiffs have been and will continue to be damaged.

**COUNT XII**

**(Fraudulent Misrepresentation)**

169. Plaintiffs expressly incorporate the allegations set forth above as if fully set forth herein.

170. Baber was legally obligated to disclose all material facts relating to his dealings with Plaintiffs in relation to the operations of Money Mailer, and Baber's employment as a corporate officer therefor, by virtue of his status as a fiduciary to Plaintiffs.

171. Baber failed to disclose material facts relating to his intentions with respect to RSVP, namely that he was advising Money Mailer to reject the opportunity to acquire RSVP, so that he could acquire an interest in RSVP himself, and directly compete against Money Mailer.

172. This information was material to Plaintiffs and the operations of Money Mailer, and Plaintiffs could not have readily learned of Baber's intentions absence disclosure by Baber.

173. Baber intentionally failed to disclose this information for the purpose of advising his own interest and to facilitate his scheme to acquire RSVP for his own benefit and to the detriment of Money Mailer.

174. By reason of the foregoing, Plaintiffs have been irreparably harmed and damaged.

## COUNT XIII

### (Injunctive Relief)

175. Plaintiffs expressly incorporate the allegations set forth above as if fully set forth herein.

176. Plaintiffs are entitled to injunctive relief pursuant to Federal Rule of Civil Procedure 65.

177. Baber breached his fiduciary duties to Plaintiffs and engaged in bad faith and malicious conduct against Plaintiffs by misusing corporate assets and acquiring a directly competing business, after causing Money Mailer to reject an opportunity to acquire the very same business, all while being employed as an officer of Money Mailer, usurping business opportunities away from Money Mailer for his own personal gain, and attempting to solicit Money Mailer employees to work for Baber's competing company.

178. Baber has also breached the Franchise Agreement's non-competition provisions by engaging in a directly competing business in the same or related business of Money Mailer.

179. Plaintiffs will suffer irreparable harm if Baber is not enjoined from unfairly competing with Money Mailer and violating the Franchise Agreement's non-competition provisions.

180. Plaintiffs will suffer irreparable harm if Baber is not enjoined from soliciting or contacting Money Mailer's employees, franchisees, and customers.

181. Baber's actions have and continue to cause irreparable harm to Plaintiffs.

182. The balance of equities favors Plaintiffs.

183. Plaintiffs have no adequate remedy at law for this irreparable harm, and, by reason thereof, Plaintiffs are entitled to injunctive relief.

## COUNT XIV

**(Declaratory Judgment)**

184. Plaintiffs expressly incorporate the allegations set forth above as if fully set forth herein.

185. There is a justiciable controversy as to whether Baber was properly terminated from his position as CEO for cause under the Employment Agreement, based on the wrongful and unlawful conduct alleged herein.

186. By reason of the foregoing, Plaintiffs are entitled to a declaration of the parties' rights and duties under the Employment Agreement, including, without limitation, a declaration that Baber's termination from his position as CEO amounted to a for cause termination under the Employment Agreement.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Baber, as follows:

(a) Preliminary and permanent injunctive relief directing that Baber shall (i) refrain from soliciting or contacting Money Mailers customers or franchisees; (ii) refrain from soliciting or contacting Money Mailer's employees; (iii) refrain from the disclosure or use of Money Mailer's Trade Secrets and otherwise unfairly competing with Money Mailer; (iv) return any and all business information, documents, communications and property of Money Mailer in his possession, custody or control and/or that he took from Money Mailer, including, without limitation, any and all trade secret, confidential and/or proprietary information, information related to the names and contact information of Money Mailer's customers or franchisees, and any other property of any nature; (v) hold RSVP, with its successor or assigns, and any and all of RSVP's assets or property, with any profits generated therefrom, in trust for the sole and exclusive benefit of Money Mailer; and (vi) cease any and all acts or activities which either directly or indirectly aid or assist in the conduct of any business that is similar or related to Money Mailer's business, including, without limitation, any and all activities by, or on behalf of, RSVP as a proprietor, partner, interest holder, investor, shareholder, director, officer, employee, principal, agent, independent contractor, advisor or consultant.

(b) Imposing a constructive trust upon any and all corporate opportunities usurped by Baber, including, without limitation, RSVP, with its successors or assigns, and any and all of RSVP's assets or property, with any profits generated therefrom, in trust for the sole and exclusive benefit of Money Mailer, and transferring same to Money Mailer.

(c) Declaring that Money Mailer acted in accordance with the Employment Agreement in terminating Baber for cause;

(d) Awarding Plaintiffs damages in an amount to be determined at trial, including compensatory, consequential, nominal and punitive damages except on Count VIII for which Money Mailer only seeks injunctive relief; and

(e) Awarding any and all such other relief as deemed just and warranted.

Dated: Madison, New Jersey
June 12, 2026

KELLEY DRYE & WARREN LLP

By: */s/ Robert I. Steiner*
Robert I. Steiner, Esq.
Ryan M. Dunn, Esq.

7 Giralda Farms, Suite 340
Madison, NJ 07940
Tel: (973) 503-5900
Email: rsteiner@kelleydrye.com

*Attorneys for Plaintiffs*
*Money Mailer, LLC and Salu Group, Inc.*

**DEMAND FOR JURY TRIAL**

Plaintiffs Money Mailer, LLC and Salu Group, Inc. hereby demand a jury trial on all issues so triable in this action.

Dated: Madison, New Jersey
June 12, 2026

KELLEY DRYE & WARREN LLP

By: */s/ Robert I. Steiner*
Robert I. Steiner, Esq.
Ryan M. Dunn, Esq.

7 Giralda Farms, Suite 340
Madison, NJ 07940
Tel: (973) 503-5900
Email: rsteiner@kelleydrye.com

*Attorneys for Plaintiffs*
*Money Mailer, LLC and Salu Group, Inc.*